IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| SUSAN LOUISE SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  05-3031 |
| | ) | |
| AFSCME ILLINOIS COUNCIL 31, | ) | |
| | ) | |
| Defendant. | ) | |

<u>OPINION</u>

JEANNE E. SCOTT, U.S. District Judge:

This matter comes before the Court on Defendant AFSCME Illinois Council 31's (Union) Motion for Summary Judgment (d/e 17). The Plaintiff Susan Louise Smith was fired by the Union on August 26, 2003. Smith's Complaint (d/e 4) alleges that the Union violated her rights under the Americans with Disabilities Act (ADA) and § 510 of the Employee Retirement Income Security Act (ERISA). 42 U.S.C. §12101, <u>et</u> <u>seq</u>.; 29 U.S.C. § 1140. Smith concedes that the Union is entitled to summary judgment on her ADA claim because she has no evidence that she was disabled within the meaning of the ADA. <u>Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment (d/e 29)</u>

1

(Response), at 2. Smith has also failed to present evidence of a violation of ERISA § 510. The Union's Motion for Summary Judgment is therefore allowed.

STATEMENT OF FACTS

Smith began working for the Union in October 1990, as an accountant/bookkeeper. She worked at the Union's Springfield, Illinois, office. She worked for the Union until she was fired on August 26, 2003. At the time of her termination, she held the position of Administrative Accountant. In that position, she maintained the Union's accounting books. She also administered the payroll for the Union. Defendant's Motion for Summary Judgment (d/e 17) (Defendant's Motion), Statement of Undisputed Facts, ¶ 11; Response, at 3. Her supervisor was the Union's Business Manager William Sarver. Sarver reported directly to the Union's Executive Director Henry Bayer. Defendant's Motion, Exhibit A, Declaration of Henry Bayer (Bayer Declaration), ¶¶ 1, 4; Declaration of William Sarver (d/e 22) (Sarver Declaration), ¶ 1. Sarver worked in the Springfield office with Smith. Bayer worked at the Union's Chicago, Illinois, office.

The Union provided health and disability benefits pursuant to the

terms of the Collective Bargaining Agreement with the United Counsel Staff Union of Illinois. Smith's position was non-union, but she received the same health and disability benefits. <u>Defendant's Motion</u>, Exhibit B, <u>Deposition of Susan Louise Smith (Smith Deposition)</u>, at 31-32. The parties agree that the Union's health and disability benefit plan was an ERISA qualified plan. The plan was a self-insured plan. The Union paid claims up to a point called a stop/loss point. Thereafter, other insurance purchased by the Union paid the claims. In 2006, the stop/loss point per beneficiary was $70,000.00, and the annual aggregate stop/loss point for the entire plan was in excess of $2,000,000.00. <u>Response</u>, Exhibit 3, <u>Deposition of Henry Scheff</u>, at 18-21. The stop/loss amounts in 2003 would have been somewhat less. <u>Id.</u>

    Sarver, as the Union's Business Manager, reviewed weekly expense reports. These reports included information on all expenses, including the cost of health claims under the Union's plan. <u>Id.</u>, at 141. Bayer approved monthly financial reports for the Union. Smith states that each Monday she received a listing of all health claims from the Union's third party administrator Allied Benefit Systems (Allied). Each claim on the report listed the insured employee, the amount of the payment, the service

3

provider, the date of payment, and whether the patient was the employee or a dependent. Smith made sure that the appropriate funds were transferred to the account that was used to pay the claims. Response, Exhibit 7, Affidavit of Sue Smith, ¶ 10.

Smith states that Sarver thoroughly reviewed these weekly reports. From time to time he wanted Smith to inquire of Allied why individuals were taking certain medications and to make other inquiries of Allied. Id., ¶ 11. According to James Kenney, a customer service representative at Allied, Sarver often contacted him about large bills. Response, Exhibit 13, Declaration of B. James Kenney, ¶¶ 3, 6. Kenney states:

> It was typical when an AFSCME claim was paid that involved a high dollar amount, either for surgery or for medication, that Mr. Sarver would contact me. He would typically ask me who the patient was, what was the medical condition being treated and what the prognosis of the patient was. He also asked for an expectation of future costs that were likely to be incurred.

Id., ¶ 7. Kinney also states that Sarver's inquiries, "were not consistent with the actions of other clients. In fact, it was rare that any of our other clients would ask for any information pertaining to beneficiaries." Id.[1]  Sarver

---

[1] Kenney also expressed his opinion that Sarver had no business need for this information. Kenney Declaration, ¶ 9. Kenney is not disclosed as an expert witness in this case, and Smith provides no foundation for the basis of his opinion. See Fed. R. Evid. 702; Fed. R. Civ. P. 26(a)(2). The Court, therefore, will not consider Kenney's

4

states that he only spoke to Allied representatives about specific claims in the last quarter of each year as part of the contract renewal process. He states that otherwise he did not inquire about specific claims. <u>Sarver Deposition</u>, at 110. Sarver states that he had no other reason to need this information. <u>Id.</u>

Smith was never formally disciplined during her tenure with the Union prior to her discharge. Smith was also competent at her job. Sarver states, however, that some employees complained that she was rude and obnoxious. Sarver said that Smith could be "downright hateful" to people. <u>Id.</u>, at 36. Sarver also states that Smith would not hesitate to go over his head to speak directly with Bayer. <u>Id.</u>, at 35. Smith agreed that she would contact Bayer directly if she had an issue to discuss. <u>Smith Deposition</u>, at 30. Sarver also states that Smith would send out emails on behalf of the Union without prior approval. He told her that he did not want any emails to go out without his prior authorization. <u>Sarver Deposition</u>, at 43-44. Sarver states that he did not formally discipline Smith because the process would be too time consuming. Sarver talked to Smith directly if he had a problem with her. <u>Id.</u>, at 37-40

---

opinions.

On July 4, 1998, Smith was diagnosed with a brain aneurysm. On July 6, 1998, she underwent surgery in which clips were inserted into her brain to stop the blood flow to the aneurysm. The surgeons also put plates in her head. Smith Affidavit, ¶ 15. She was off work for about three weeks after this surgery. She worked half days the first week of her return. Thereafter, she worked full time. Id., ¶ 16. The Union's ERISA plan paid $52,810.57 for Smith's medical bills in 1998. Response, Exhibit 4, Summary of Large Claims.

In August 2002, Smith had an annual medical examination. As a result of the examination, she was referred to an endocrinologist. The endocrinologist recommended an MRI, but the MRI could not be performed because of the clips inserted in the 1998 surgery. Thus, in January 2003, Smith underwent a CT scan. On February 8, 2003, she was informed that the scan showed she had a brain tumor. Id., ¶ 17. On that day, Smith advised Sarver and Bayer that she had a brain tumor and would need to schedule surgery in the near future. Smith Affidavit, ¶ 19. She requested and received leave to undergo surgery to remove the tumor. The surgery

occurred on May 22, 2003. <u>Smith Deposition</u>, at 39.[2] The Union's ERISA plan paid $31,391.94 for Smith's 2003 medical bills.

Smith returned to work on August 11, 2003. Smith met with Sarver that morning. Sarver's assistant Stacy Pflugmacher was also present, but did not say anything during the meeting. Sarver asked Smith how she was feeling. Smith said she was fine. She said that a post-operative CT scan showed that the tumor was still there, but was much smaller than before the surgery. She had Sarver feel the scar on her head. Sarver asked if the tumor was cancerous. She told him no, it was totally benign. Smith said that her doctor told her she would need a CT scan every six months and probably need additional brain surgery in the future. Sarver also asked why she was wearing glasses. She explained that there was so much swelling in her brain that her eyes could not focus correctly. She needed the glasses until the swelling went down. She said that this was a transitory thing. Sarver and Smith also discussed the fact that she could not walk in a straight line. The entire conversation lasted about fifteen minutes. At the end of the conversation, Sarver said that he would need the budget. She asked him to

---

[2]Smith states in her Affidavit that the surgery occurred on May 27, 2003. <u>Smith Affidavit</u>, ¶ 18. There is no explanation for this discrepancy.

let her get accustomed to where she was since she just returned that morning. She said that once the books were closed, she would work on the budget. Smith Deposition, at 67-70; Smith Affidavit, ¶ 21.

Sarver states that during the first two weeks after Smith returned to work, several problems arose. Smith had several disagreements with Pflugmacher. Pflugmacher and Smith disagreed over Smith's accrual of sick time and vacation time. Smith had used time from a "time bank" during her leave. The time bank was available to individuals, such as Smith, who were on extended leave. Sarver states when a person uses time from the time bank, she does not accrue sick leave or vacation leave. Smith, however, claimed that she should have accrued sick leave and vacation leave during this time. Id., at 49-52. Pflugmacher and Smith also had a disagreement over a payroll check that Smith cut for an employee. Pflugmacher and Smith disagreed over whether Smith had calculated the withholding properly. Id., at 56-57. Smith also took an emergency vacation day without following proper procedures. Smith left a voice mail message for Pflugmacher informing her that Smith was taking the day off. Smith was supposed to clear the use of a vacation day with Pflugmacher and give a reason for the need for the emergency vacation day off. She did not,

8

according to Sarver. In addition, Sarver states that Smith did not have any accrued vacation days to use. Id., at 53. Sarver states that Smith also took one to two hours off one other day. Smith expected to be paid for the time, but she did not have any accrued vacation or sick time left. Id., at 55. Last, Smith sent out a letter from the department without prior authorization. Sarver did not want Smith sending out letters for the department. According to Sarver, she had done this in the past, and she was told not to do so. Id., at 59-60.[3]

Sarver had a telephone conversation with Smith on August 22, 2003. Sarver made contemporaneous notes concerning this conversation. Response, Exhibit 10, at 1-3, Sarver Notes dated August 22, 2003. Sarver discussed with Smith the miscalculated paycheck, the emergency request for vacation, and the letter sent out by Smith without approval. Smith claimed that she calculated the paycheck using tax tables. With respect to the

---

[3]Smith states in her Affidavit that during the two weeks from August 11, 2003, to August 26, 2003, no one had said anything to her to indicate that there were any problems with her employment or any concerns about her work. Smith Affidavit, ¶ 22. Smith, however, agreed in her deposition that she had some simmering issues at work on August 26, 2003. She specifically states that there were issues about: (1) her request for one hour off on August 18, 2003, (2) whether she had any accrued leave, and (3) whether she had calculated the withholding on a paycheck accurately. Smith Deposition, at 93-96. The Court will disregard her Affidavit to the extent that it conflicts with her deposition testimony. Piscione v Ernst & Young, L.L.P., 171 F.3d 527, 532-33 (7th Cir. 1999).

9

emergency vacation, Sarver told her she needed a reason for the emergency request. Smith questioned why she needed to provide a reason. During the conversation, Smith asked Sarver whether he was harassing her. Sarver responded that he was asking for something that was not out of line. Smith indicated that she left a voice mail for Pflugmacher stating that she was sick. Sarver also spoke to Smith at this time about sending out the letter without his approval. He told her that he only wanted correspondence going out over his name or the office manager's name, not hers. Sarver described the call as confrontational. <u>Sarver Deposition</u>, at 144-54. After this conversation, Sarver planned to meet with Smith in person to discuss these problems. On Saturday, August 23, 2003, Sarver prepared a list of topics to discuss with Smith. <u>Response</u>, Exhibit 10, at 4, <u>Sarver Notes dated August 23, 2003</u>. The notes detail each of the five problems. Sarver made a note that Smith thrived on dissension and discord, and keeping things stirred up. Sarver explained the note in his deposition: "What I meant by that is precisely exactly what it says. That Sue in my estimation thrives on dissension and discord in the office and is happiest when things are stirred up to the greatest amount." <u>Sarver Deposition</u>, at 158. Sarver states that he based this opinion on his own observations, information from

Pflugmacher, and complaints from other employees in the past. Id., at 21-37, 158.

On Sunday, August 24, 2003, Sarver had a telephone conversation with Bayer in which they discussed Smith. Sarver, again, made notes of the call. Response, Exhibit 10, at 5-10, Sarver Notes dated August 24, 2003. Bayer told Sarver to meet with Smith and let her know what he expected of her so she could correct the problems. Sarver states that Bayer said to give Smith a chance after that to correct the problems before implementing any discipline or termination. Bayer was reluctant to fire a staff member with thirteen years seniority without first giving her a warning and a chance to improve. Sarver states that Bayer mentioned the possibility of termination first. Bayer does not remember, but thought that Sarver could have mentioned termination first. In any event, Bayer's instruction was for Sarver to meet with Smith to lay out the problems and tell her what he expected of her to correct the problems. Sarver Deposition, at 164-71, 179; Bayer Deposition, at 17.

On Monday, August 25, 2003, Sarver was out of the office. Sarver Deposition, at 180. On Tuesday, August 26, 2003, Sarver asked Smith to come to his office for the meeting in accordance with his August 24, 2003,

conversation with Bayer.  Pflugmacher was also present.  Sarver did not tell Smith the purpose of the meeting.  Once Smith arrived at Sarver's office, Pflugmacher asked Sarver if she should close the door for the meeting.  Sarver said yes.  Smith stated that she would not participate in a meeting with the door closed.  Smith understood that Sarver was ordering her to participate in a closed-door meeting.  Smith said she would call Bayer about this.  Sarver said go ahead.  <u>Smith Deposition</u>, at 99-104.

Smith then left Sarver's office and telephoned Bayer.  He was unavailable, and so, she left a message.  Sarver also called Bayer and discussed the situation with him.  Bayer states that he told Sarver to direct Smith to attend the meeting and give her one more chance.  If she refused to attend the meeting, Sarver was to fire her.  After Bayer spoke with Sarver, he returned Smith's call.  Bayer told Smith that she had to attend the closed-door meeting, or else she could be disciplined.  Bayer told her that the purpose of the meeting was not disciplinary.  Smith asked if she could have a witness at the meeting or if she could tape-record the meeting.  Bayer said no.  Smith again understood that she had been ordered to participate in the closed-door meeting and that she could be disciplined if she refused.  <u>Id.</u>, at 106-110.  Bayer states in his Affidavit that he told Sarver that he

12

should terminate Smith if she refused to attend a meeting with the door closed.  Bayer Declaration, ¶ 5.

Later that day, Smith was again called to Sarver's office. According to Smith, she stood in the doorway of Sarver's office so that the door could not be shut.  Smith Deposition, at 110.[4]  According to Smith, Sarver told her she had five minutes to vacate the building.  Id.  According to Sarver, he asked her to attend a meeting with the door closed, but she refused.  He then fired her for insubordination.  Sarver Declaration, ¶ 7.[5]

Smith states that she believes Sarver intended to fire her at the closed-door meeting all along.  She said that Sarver used closed-door meetings for discipline.  She admitted, however, that she had been in closed-door

---

[4]According to Smith's Affidavit, Pflugmacher said when this second attempt at a meeting began, "[I]s this when I close the door?"  Smith Affidavit, ¶ 23.  Smith argues in her brief that Pflugmacher made this statement at the first attempt at a meeting on August 26, 2003.  Response, at 4, Statements of Fact Smith Disputes, ¶ 36.  The Affidavit, however, states that the statement occurred at the second attempted meeting when Smith was fired.  Smith Affidavit, ¶ 23.  The Affidavit does not discuss the first attempt to conduct a meeting on August 26, 2003, but Smith discusses the first attempt in her deposition.  Smith Deposition, at 99-104.

[5]The Court also notes that paragraph 23 of the Smith Affidavit contains a typographical error.  The paragraph states that the attempt at a meeting and her firing occurred on August 23, 2003.  Smith Affidavit, ¶ 23.  In the previous paragraph, she acknowledged that she was fired on August 26, 2003.  Id., ¶ 22.  Her Response also states that these events occurred on August 26, 2003.  Response, at 22, Smith's Statement of Additional Undisputed Facts, ¶ 103.  The August 23, 2003, date in the Affidavit is a typographical error.

meetings with Sarver that did not involve disciplinary matters. Id., at 116-20.

Smith has submitted a document entitled, "Declaration of Laura Gates." Response, Exhibit 9, Declaration of Laura Gates (Gates Statement). Gates states that she worked for the Union, and Sarver was her supervisor. She suffered a stroke on July 7, 2002. Shortly after she returned to work, Sarver fired her. Gates states that "[d]uring the termination process, he stated the stress of the job probably contributed to my stroke." Gates Statement, ¶ 7. The document is signed by Laura Gates, but she neither signed the statement under oath, nor declared that she made the statements under penalty of perjury. See 28 U.S.C. § 1746. Thus, the statement is not proper evidence at summary judgment. Fed. R. Civ. P. 56(e).[6]

## ANALYSIS

Smith claims that the Union wrongfully terminated her in order to

---

[6]Smith also submitted a pro se response to the summary judgment motion before her counsel entered his appearance in this case. Plaintiff's Response to Defendant's Motion for Summary Judgment (d/e 20). The Court will not consider that Response at this time since her counsel conducted additional discovery and filed a new Response. The Court notes that Smith's Response included large numbers of documents that were not properly authenticated and contained hearsay. The Union objected to these documents, and the objections would have been well-taken. Defendant's Reply to Plaintiff's Response to Motion for Summary Judgment (d/e 21), at 2-4. The matter, however, is moot because of the new Response filed by Smith's counsel.

deny her benefits under the Union's ERISA qualified plans, or to retaliate against her because she used those benefits, in violation of ERISA § 510. Smith concedes she has no claim under the ADA. The Union now moves for summary judgment. At summary judgment, the Union must present evidence that demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). The Court must consider the evidence presented in the light most favorable to Smith. Any doubt as to the existence of a genuine issue for trial must be resolved against the Union. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Once the Union has met its burden, Smith must present evidence to show that issues of fact remain with respect to an issue essential to her case, and on which she will bear the burden of proof at trial. Celotex Corp., 477 U.S. at 322; Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In this case, Smith has failed to present sufficient evidence to overcome summary judgment on her ERISA claim.

Section 510 of ERISA prohibits discharging a person either to prevent the person from using benefits to which she is entitled under an ERISA qualified plan, or to retaliate against a person because she used those benefits. 29 U.S.C. § 1140. Section 510, however, requires proof of a

specific intent to deny benefits or to retaliate for using benefits. Lindemann v. Mobil Oil Corp., 141 F.3d 290, 295 (7th Cir. 1998). Smith may establish a claim under § 510 through either direct or indirect evidence. Direct evidence consists of evidence that proves a claim without the need for inference or presumption. Troupe v. May Dept. Stores, Co., 20 F.3d 734, 736 (7th Cir. 1994). Smith has not presented any direct evidence.

Under the indirect method, Smith must present evidence that she: (1) was a member of a protected class; (2) was qualified for her job; and (3) was discharged under circumstances that provide some basis for believing that a prohibited intent was present. Lindemann, 141 F.3d at 296. If she presents such evidence, the Union must present a non-discriminatory reason for its actions. Smith must then present evidence to prove that the stated reason is a pretext. Salus v. GTE Directories Service Corp., 104 F.3d 131, 134 (7th Cir. 1997). A pretext is a lie. Smith, therefore, must present evidence that the stated reason is not the true reason for the actions; it is not sufficient to prove that there is no factual basis for the stated reason or the stated reason was not sufficient to motivate the action. Smith must show that the stated reason is false. Forrester v. Rauland-Borg Corp., 453 F.3d 416, 418-19 (7th Cir. 2006). Smith has presented evidence on the first

two elements. She was a participant in the ERISA qualified plans and so was entitled to benefits. She further appears to be qualified for her job.

Smith's evidence on the third element of the prima facie shows that: (1) she used benefits and was subsequently fired; (2) Bayer and Sarver, as part of their regular duties, received reports that included information on the costs of employee health claims; and (3) Sarver carefully reviewed weekly reports and, on occasion, sought additional information about large medical bills for beneficiaries under the Union health plan. This evidence provides very little to suggest that Sarver or Bayer acted out of a prohibited intent. The mere sequence of events that she used benefits and then was fired does not indicate a suspicious circumstance; otherwise, every case would be suspicious. Sarver's interest in large medical bills is unusual, but there is no evidence that he had an interest in Smith's medical bills, and there is no evidence that he took any action with respect to large medical bills other than to inquire about the charges.

Even assuming the evidence showed circumstances that provide some basis for finding an improper intent, the Union has presented a valid, non-discriminatory reason for its actions: Smith was insubordinate. From August 11, 2003, to August 22, 2003, Sarver had five problems with Smith.

Smith agrees that several issues were simmering. Bayer instructed Sarver to have a meeting with Smith to tell Smith what was expected of her. Sarver called the closed-door meeting, but Smith refused to attend. Smith then went over Sarver's head to contact Bayer directly. Bayer told Smith to attend the closed-door meeting, and he told Sarver to fire her if she did not attend. Smith refused to attend and was fired. Her insubordination was a valid, non-discriminatory reason for her firing. Hottenroth v. Village of Slinger, 388 F.3d 1015, 1031-32 (7th Cir. 2004); see Kahn v. U.S. Secretary of Labor, 64 F.3d 271, 279 (7th Cir. 1995).

Smith speculates that Sarver planned to fire her all along and that was the reason he intended to have a closed-door meeting. She has no evidence, however. Smith states that Sarver has held closed-door meetings to discipline people, but also for reasons other than discipline. Smith Deposition, at 116, 119-20. Thus, the fact that it was a closed-door meeting does not show that the meeting was disciplinary.

There is some evidence that Sarver brought up the subject of termination in the August 24, 2003, telephone conversation with Bayer, but Bayer rejected any suggestion to fire her. Rather, Bayer told Sarver to meet with Smith to discuss the problems and to give Smith another chance.

Sarver attempted to comply with Bayer's instructions, but Smith refused to attend the meeting. Sarver then contacted Bayer again, and only then did Bayer instruct Sarver to terminate Smith if she would not attend the meeting. Bayer also told Smith directly to attend the closed-door meeting. Smith again refused and only then was she fired. The evidence is consistent with the Union's position that Smith was fired only when she refused to follow direct orders from both Bayer and Sarver.

Smith says that Sarver engaged in "bizarre" conduct by reviewing medical bills. See Response, at 41. She makes no connection between Sarver's practice to review medical bills and his dealing with her. Her speculation about Sarver's intent is not sufficient. Bayer made the decision to fire Smith because she refused to obey a direct order to attend the closed-door meeting.

She submits a statement from Gates, but, as explained above, the statement is not competent evidence. If the Court considered Gates' statement, the statement says that Sarver fired Gates shortly after she suffered stroke. The similarity with Smith's case might support the third element of the prima facie case that the similar timing of both firings provide some basis for believing that a prohibited intent was present. The

statement, however, would not show that the Union's non-discriminatory reason for firing Smith for insubordination was a pretext. The evidence clearly shows that Smith intentionally refused to obey direct orders from both Sarver and Bayer. The Union is entitled to summary judgment.

THEREFORE, the Defendant's Motion for Summary Judgment (d/e 17) is ALLOWED. Judgment is entered in favor of Defendant AFSCME Illinois Council 31 against Plaintiff Susan Louise Smith. All pending motions are denied as moot. This case is closed.

IT IS THEREFORE SO ORDERED.

ENTER: November 16, 2006.

FOR THE COURT:

                              s/ Jeanne E. Scott
                              JEANNE E. SCOTT
                              UNITED STATES DISTRICT JUDGE